UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ROMAN SASIK, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>AT&T Wireless Services, Inc.<br><br>　　　　Defendant. | CV 05-02346 ABC (CWx)<br>CV 07-05087 ABC (CWx)<br><br>ORDER FINDING NO PREEMPTION |
| JANE WALDMANN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>CINGULAR WIRELESS LLC<br><br>　　　　Defendant. | |

### I. INTRODUCTION

The active complaints in these two matters each allege that Defendants AT&T Wireless Services, Inc. ("AWS") and Cingular Wireless, LLC ("Cingular") improperly charged consumers an Early Termination Fee ("ETF") when consumers cancelled their subscription for wireless

services. Defendants[1] moved to dismiss, arguing that Plaintiffs' claims are preempted by the Federal Communications Act ("FCA") which gives the Federal Government exclusive control over a wireless carrier's rates. The Court denied those motions because, as pled, Defendants' ETFs did not constitute "rates," the relevant aspect of wireless communications subject to preemption. However, the Court's ruling did not definitively resolve the preemption issue and, after conducting expedited discovery, the parties again submitting briefing, this time with evidence, as to whether Plaintiffs' claims are preempted. After reviewing the material submitted, the Court **FINDS**, for the reasons discussed below, that Plaintiffs' claims are not preempted by the FCA.

## II. PREEMPTION

Under 47 U.S.C. § 332(c)(3)(A), "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." Accordingly, claims based on state law that have the effect of regulating "rates" are preempted while claims concerning "other terms and conditions" are not.

Unfortunately, "rate" is not defined in the statute. However, the Federal Communications Commission ("FCC") has provided some guidance as to how "rate" should be construed:

> [A] "rate" has no significance without the element of service for which it applies. . . . [T]he term "rate" is defined in the

---

[1] AT&T merged with Cingular in October 2004. (Corley Decl. ¶ 3.) Although not entirely clear, the new entity handling wireless services appears to be AT&T Mobility, LLC ("AT&T Mobility"). (Farber Decl. ¶ 1.)

2

dictionary as an "amount of payment or charge <u>based on some other amount</u>." [<u>Webster's Third New International Dictionary</u> (1993) (emphasis added).] In this regard also, the Supreme Court has recently stated:

> Rates, however, do not exist in isolation. They have meaning only when one knows the services to which they are attached.

<u>In the Matter of Southwestern Bell Mobile Systems, Inc.</u>, 14 F.C.C.R. 19898, 19906 (1999) (quoting <u>American Telephone and Telegraph Company v. Central Office Telephone, Inc.</u>, 524 U.S. 214, 223 (1998)). In <u>Southwestern</u>, the FCC concluded "that the term 'rates charged' in Section 332(c)(3)(A) may include both rate levels and rate structures for [wireless services] and that the states are precluded from regulating either of these." <u>Southwestern Bell</u>, 14 F.C.C.R. at 19907.[2]

A state-based claim that does not, on its face, challenge rates can still be sufficiently entangled with rates to result in preemption. <u>Fedor</u>, 355 F.3d at 1073 ("the FCC distinguished between claims that would enmesh the courts in a determination of the reasonableness of a rate charged [resulting in preemption] and those that would require examination of rates in the context of assessing damages, but would not involve the court in such a reasonableness inquiry"). The FCC has "reject[ed] the argument that any claims related to the billing amount are automatically preempted under § 332." <u>Fedor</u>, 355 F.3d at 1074.

Simply because a state-law-based claim might result in increased costs to the carrier does not, by itself, mean the action regulates

---

[2]The Court finds the FCC's reasoning sound, thorough, and persuasive. See <u>Wyeth v. Levine</u>, 129 S.Ct. 1187, 1201 (2009) ("The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness."); <u>Fedor v. Cingular Wireless Corp.</u>, 355 F.3d 1069, 1073 (7th Cir. 2004) ("opinions by the FCC are entitled to deference").

rates. See Southwestern Bell, 14 F.C.C.R. at 19908; In the Matter of Wireless Consumers Alliance, Inc., 15 F.C.C.R. 17021, 17034 (2000) ("We hold that Section 332 does not generally preempt the award of monetary damages by state courts based on state consumer protection, tort, or contract claims. We note, however, that whether a specific damage calculation is prohibited by Section 332 will depend on the specific details of the award and the facts and circumstances of a particular case.").

### III. DISCUSSION

Examination of Defendants' ETFs will not enmesh the Court in a determination of the reasonableness of Defendants' rates. Although Defendants submit a substantial amount of evidence that shows that there is a relation between Defendants' rates and the ETF, the Court is not persuaded that that relationship makes the ETF a rate, or part of the rate structure.

For instance, Defendants state that "the purpose and role played by the ETF as a component of AWS's overall rates and rate structures remained the same" throughout the company's history. (Corley Decl. ¶ 13.) In this regard, Defendants state that the ETF is used "to recover some of [their] up-front acquisition costs and/or [their] lost profits from early termination." (Corley Decl. ¶ 15.) In addition, plans with ETFs also contained more favorable terms as to "monthly access charges or handset prices." (Corley Decl. ¶ 17.) Assuming all of this is true, however, it does not make the ETF a rate. All this shows is that the costs allegedly related to the ETF, like any other costs associated with providing wireless service, were taken into consideration when determining the actual rates charged. The Court does not see why it should view the relationship between the costs

covered by the ETF and the actual rates any differently than the relationship between the cost to erect cell towers and the rates, or the relationship between the cost for executive compensation and the rates. Iowa v. U.S. Cellular Corp., No. 4-00-CV-90197, 2000 WL 33915909, at *5 (S.D. Iowa 2000) ("If 'rate' included any action that indirectly induced rate increases, the exception would be swallowed by the rule. This could not have been Congress' intent. US Cellular's interpretation would destroy the Act's savings clause, making all actions affecting the company federal in nature.").

Furthermore, the way Defendants' ETFs operated in practice does not tie them to any actual service provided. When AWS was first established, it had a flat $150 ETF policy for new customers--"flat" meaning the amount did not change whether a customer terminated early in the relationship or late in the relationship. (Corley Decl. ¶ 8.)[3,4,5] The fee was also the same whether a customer entered into a one-year or two-year contract. (Corley Decl. ¶ 15, Ex. 7 [Rate Brochure at ATTWS228351].) As to this fee structure, the Court finds the analysis of then Chief Judge Murphy from the Southern District of Illinois especially cogent and will quote it at length:

> Defendants' position, in a nutshell, is that the $150 specified as liquidated damages recoups the loss occasioned when a customer quits paying before the expiration of the agreed term for the

---

[3]Some customers with agreements that preceded the creation of AWS, but which were subsumed by AWS, had prorated ETFs. (Corley Decl. ¶ 9.) Regardless, AWS switched to a uniform flat rate policy in 2001. (Corley Decl. ¶¶ 8, 26, 27.) Prior to 2006, Cingular also had various flat and prorated rates corresponding to various predecessor markets. (Farber Decl. ¶ 27.) In 2006 Cingular likewise switched to a flat ETF ($175) for all customers. (Farber Decl. ¶ 29.)

[4]In 2002, AWS changed to a $175 flat ETF. (Corley Decl. ¶ 11.)

[5]For reasons not entirely clear, the policy for AWS was different in New York where customers were only charged for the monthly charges remaining on their contracts, up to the amount of the ETF. (Corley Decl. ¶ 8.)

service. The idea is that the actual cost of the service is spread over the entire agreed term so that the up-front costs are amortized according to the length of the term. This makes it possible for the service to be provided without a customer paying a hefty initial fee. Thus, the LDP[6] falls squarely within its rate structure and is preempted.

Cingular could structure its rates so that a shorter term carried a higher initial fee. Similarly, rates could be structured so that the monthly fee is higher for a shorter term agreement. This being the case, it follows that Cingular could accomplish the same thing by adjusting the rate at the end when the customer does not continue with the service for the agreed term. In short, rate structure is no less rate structure because rates are computed at the end rather than the beginning of the service.

The only question is whether the LDP is really a retrospective rate adjustment. By its terms, the LDP kicks in irrespective of how far into the term of the agreement the service is terminated. The customer who terminates in the 23rd month is treated the same as one who walks away after one month of service. Moreover, there is no distinction made between agreements of different duration. The LDP provides for $150 in liquidated damages regardless of the term of the agreement or when the customer walks away from the service.

There is no question that a cellular provider could fashion an LDP that is undisputedly an integral part of its rate structure. But that is not the case here. All that can be said with certainty is that the LDP discourages the customer from terminating service before the expiration of the agreement. This can serve legitimate and important business considerations, such as maintaining market share or holding down the market share of competitors. These concepts, however, are different from rate structure. If the LDP was prorated or adjusted according to the term of the agreement, this Court would look at things differently. In short, the Court finds that the LDP is not a part of Defendants' rate-making structure and, thus, it escapes federal preemption.

Kinkel v. Cingular Wireless, CV 02-00999 GPM, slip op., at 3-4 (S.D. Ill. November 8, 2002) (slip opinion).

The Court agrees with Chief Judge Murphy's analysis. When the ETF is not prorated or does not vary based on the length of the contract, the ETF cannot be considered part of Defendants' rates. Indeed, an ETF charged near the end of a contract cannot, by any

---

[6] "LDP" is the ETF, referred to by Chief Judge Murphy as the Liquidated Damages Provision.

stretch of the imagination, be related to any service provided by Defendants.[7,8] Southwestern Bell, 14 F.C.C.R. at 19906 ("Rates . . . have meaning only when one knows the services to which they are attached. [citation omitted]"). The fact that Defendants implemented flat ETFs that did not vary based on the length of the contract--and even converted pro-rated ETFs to this format--belies any assertion that Defendants' ETFs constituted rates or part of Defendants' rate structure.[9]

## IV. CONCLUSION

The Court finds that Defendants put a great deal of thought and analysis into whether they should charge an ETF and how much that

---

[7] Even if the ETF was supposed to act as recovery for up-front costs, by the end of the contract term those costs have already been recovered through the regularly monthly charges unless, of course, no profit is earned until the final month of the agreement. Clearly, that is not the case. One need only look at the pricing model used to develop service offerings which shows recoupment of costs prior to the end of the contract term. (See Farber Decl. ¶ 41.) Accordingly, an ETF that is meant to recover the "services" regarding acquisition costs but is charged after those acquisition costs have already been recovered is not recovering for any "service" at all.

[8] For new commitments for service after May 2008, AT&T Mobility began to deduct $5.00 from the ETF for each completed month of the agreement. (Farber Decl., Ex. 9 [Service Agreement at CW000227519].) Even under this system, however, a customer who cancels at the end of the agreement is still subject to a fee for "services" that have already been paid for over the term of the agreement; the "pro rated" figure is not prorated at all, but simply decreases by an apparently arbitrary figure of $5 per month. (See Farber Decl., Ex. 12 [Jan. 26, 2007 Prorated ETF Update at CW000226252 ("2 yr contracts will decrease to $60"; "1 yr contracts will decrease to $120")].)

[9] At oral argument, counsel for Defendants argued that the Court should follow the outcomes in two other decisions from Chief Judge Murphy, Redfern v. AT&T Wireless Servs., Inc., CV No. 03-00206 (S.D. Ill. June 16, 2003) and Chandler v. AT&T Wireless Servs., Inc., CV No. 04-00180 (S.D. Ill. July 21, 2004), rather than Kinkel. The Court does not agree. The Court is persuaded by Chief Judge Murphy's reasoning, not necessarily by the outcomes he reached. Moreover, the facts on which Redfern and Chandler are based are not clear from the orders. What is clear, here, is that when Defendants' plans have an ETF, that ETF is not "adjusted according to the term of the agreement." Kinkel at 3-4. Whether the contract was for one year or two, the ETF remained the same. (Corley Decl. ¶ 15, Ex. 7 [Rate Brochure at ATTWS228351].)

7

charge should be.  However, the ETF is not sufficiently related to a corresponding service and ultimately will not, upon review, enmesh the Court in a determination as to the reasonableness of Defendants' rates.  Accordingly, the Court **FINDS** that the ETF is not a rate or part of Defendants' rate structure and, therefore, preemption does not preclude Plaintiffs' claims.

The Court will maintain the previously scheduled dates. (<u>See</u> Minute Order (Docket No. 143); Minutes (Docket No. 145).)  The parties are **ORDERED** to submit a joint report by no later than **August 17, 2009**, with a proposed order setting forth the schedule for the class certification and arbitration motions as discussed at the hearing.

**IT IS SO ORDERED.**

**DATED: August 4, 2009**  _____
**AUDREY B. COLLINS, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**